UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MARK ALAN CARLSON,

                    Plaintiff,                         DECISION & ORDER

                                                       06-CV-6621P
          v.

JAMIESON PARRY, NEW YORK STATE
DEPARTMENT OF CORRECTIONAL
SERVICES, SUPERINTENDENT CULLY,
LIEUTENANT YONKERS, BRIAN CLIFFORD,
and STEVE SMITH,

                    Defendants.

_____

## PRELIMINARY STATEMENT

          In December 2006, plaintiff Mark Alan Carlson ("Carlson") filed this action

against the New York State Department of Correctional Services ("DOCS") and certain of its

officers at Livingston Correctional Facility, alleging that defendants violated his rights under the

First, Eighth, and Fourteenth Amendments, as well as his rights under the Americans with

Disabilities Act and the Rehabilitation Act.  (Docket # 1).  Carlson retained counsel in March

2008.  (Docket # 15).  Carlson has amended his complaint four times, the last time on March 18,

2009.  (Docket ## 4, 9, 23, 33).

          Currently pending before the Court is defendants' motion for summary judgment.

(Docket # 43).  For the reasons discussed below, defendants' motion for summary judgment is

granted as to all of Carlson's claims except his Eighth Amendment claims against defendant

Parry.

**FACTUAL BACKGROUND**

The following facts are undisputed except where otherwise noted.

**I.  Carlson's Programming Assignments**

In 1996, Carlson's right leg was partially amputated below the knee; since then he has used a prosthetic leg.  (Docket # 43-2 at ¶ 2).  In March 2005, Carlson was incarcerated pursuant to a felony conviction of driving while intoxicated and eventually was sent to DOCS's Gowanda Correctional Facility.  (*Id*. at ¶ 12; Docket # 33 at 16).

According to Carlson, on May 28, 2005, the foot of his prosthetic leg broke off, and thereafter he was unable to wear the prosthesis or walk.  (Docket # 56 at ¶¶ 18-19).  Three days later, on May 31, 2005, he fell down some stairs and tore his rotator cuff.  (*Id*. at ¶¶ 29-30; Docket # 43-2 at ¶ 44).  On June 27, 2005, Carlson received a new prosthesis, but it did not fit properly and needed adjustment.  (Docket # 56 at ¶ 33).  On August 10, 2005, Carlson filed a Notice of Intent to File a Claim against New York State regarding the May 31st incident, and he subsequently filed suit in the New York State Court of Claims.  (Docket # 44, Ex. F).

On July 14, 2005, Carlson was transferred to Livingston Correctional Facility, a facility designated for inmates with medical and mobility issues, and was evaluated by the Livingston medical unit upon arrival.  (Docket # 43-2 at ¶¶ 45-47).  Carlson testified that he told the Livingston medical staff that he was still adjusting to his new prosthesis and that he was suffering from six or seven different blister-like "hot spots" and abrasions that made walking uncomfortable.  (Docket # 44, Ex. A at 81-83).  The medical unit issued a "Program Clearance" indicating that Carlson could not climb stairs, jump, bend or reach "normally" or play contact sports, but was eligible to work in the mess hall.  (Docket # 43-2 at ¶ 66).

2

Carlson subsequently met with defendant Senior Corrections Counselor Jamieson Parry ("Parry") to determine his program assignment.[1]   (*Id*. at ¶ 61).   Parry advised Carlson that he was required to attend alcohol counseling, known as Alcohol and Substance Abuse Treatment ("ASAT") because he had been incarcerated for an alcohol-related offense.   (*Id*.).   The parties dispute whether Parry also told Carlson that he was required to attend Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA") meetings.   (Docket ## 33 at 4; 43-2 at ¶ 71).   According to Parry, he encouraged Carlson to attend those meetings, but did not order it because he did not have the authority to do so.   (Docket # 45 at ¶ 27).

Parry assigned Carlson to work in the mess hall in accordance with the program clearance from the medical unit.   (Docket # 43-2 at ¶ 63).   Carlson objected to the assignment and explained to Parry that his disability would hinder his ability to work in the mess hall.   (*Id.* at ¶ 64).   According to Carlson, he told Parry that his prosthesis was broken, he could not stand for long periods of time and could not walk any significant distance.   (Docket # 56 at ¶¶ 42-43).   In addition, Carlson told Parry that he had injured his shoulder and could not lift any significant weight.   (*Id*.).   Carlson showed Parry his residual limb by removing the prosthesis.   (Docket # 44, Ex. A at 90).

Carlson contends that Parry responded as follows:

> I must be getting soft as I get older because I'm willing to give you 30 days to get your medical bullshit 'straightened away.' But . . . I want you to know that I expect to see your name on every attendance sheet for AA and NA meetings for the next 30 days,

---

[1] According to defendants, DOCS requires inmates to participate in "programs," which consist of therapeutic, education or vocational activities.   (Docket # 43-2 at ¶ 49).   "The purpose of programs is to facilitat[e] inmates' appropriate conduct within the facility . . . , keep inmates involved in productive tasks, and prepare inmates for their eventual reintegration with society upon their release."   (*Id*. at ¶ 50).

> because if I don't see your name, believe me when I tell you, I will
> stick so many programs so far up your ass that you won't be able to
> sit down and visit with your mama when she comes to visit you!

(*Id*. at ¶ 44).  Parry denies making any such statement.  (Docket # 43-2 at ¶ 69).  It is undisputed, however, that Carlson was not assigned to any program other than ASAT for the next thirty days. (*Id*. at ¶ 75).

Carlson contends that from July 24, 2005 until mid-August 2005, he attended AA and NA meetings four nights a week.  (*Id*. at ¶¶ 45, 50).  According to Carlson, he walked 1400 yards, or 4/5 of a mile, round-trip in order to attend the meetings.  (*Id*. at ¶ 49).  By mid-August, the walking had so aggravated the injuries to his residual limb that he could no longer walk to the meetings.  (*Id*. at ¶¶ 49-50).  Specifically, Carlson testified that during August 2005 his tibia broke through the skin of his residual limb and the area became filled with pus.  (Docket # 44, Ex. A at 84-85).

According to Carlson, on or about September 1, 2005, he saw Parry, who asked him if he had been attending the AA and NA meetings.  (Docket # 56 at ¶¶ 51-52).  Carlson told Parry that he "was trying to heal some wounds on the end of [his] stump and as soon as they were healed [he] would continue with the meetings."  (*Id*. at ¶ 52).  According to Carlson, Parry responded sarcastically that he would be getting a "nice cushy" job assignment in the mail the next day.  (*Id*. at ¶ 53).  The next day, Carlson was assigned to work on the "Utility Gang," a vocational program in which inmates perform outdoor work in "various assignments, including mowing lawns, as well as outdoor cleanup and snow removal."  (Docket ## 56 at ¶ 56; 43-2 at ¶¶ 80-83).

4

Carlson initially alleged that his assignment on the Utility Gang required him to "push[] a lawnmower all afternoon," which caused "further trauma and injury" to his leg and that "the tibia in his leg broke through the skin . . . and became infected." (Docket # 33 at ¶¶ 39, 43). He later testified at his deposition, however, that he only worked on the Utility Gang for three days and never mowed any lawns. (Docket # 44, Ex. A at 101). Instead, on the first day Carlson "swept up a little bit"; on the second he "played cards"; and, on the third day he received a medical release from the Utility Gang. (*Id*. at 101-102; Docket # 43-2 at ¶¶ 87-90). Carlson further testified that he suffered no injury from his assignment to the Utility Gang.[2] (Docket # 44, Ex. A at 103).

## II.  Conviction at Disciplinary Hearing

Pursuant to DOCS policy, inmates are prohibited from helping other inmates with their legal work or possessing other inmates' legal documents. (Docket # 43-2 at ¶¶ 157, 159). In early June 2007, Carlson's cube was searched by DOCS officers based on an anonymous tip that he was assisting other inmates with their legal work without permission. (*Id*. at ¶¶ 169, 174, 176). Legal documents belonging to other inmates, specifically inmates Sanford Bell and George Rogner, were seized during the search. (*Id*. at ¶ 191). In addition, correspondence from Carlson's lawyer referring to inmates McKenna and Crump was also confiscated. (Docket ## 43-2 at ¶¶ 192-93; 49, Ex. A at 2, 21-22). Following the search, Carlson was issued a

---

[2] This Court rejects Carlson's allegation of injury made in his affidavit opposing this motion because "[i]t is well-settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." *E.E.O.C. v. Johnson & Higgins, Inc.*, 1998 WL 778369, *7 (S.D.N.Y. 1998) (quoting *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987)). *See also Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("a party does not show a triable issue of fact merely by submitting an affidavit that disputes his own prior sworn testimony").

misbehavior report for possessing other inmates' crime and sentencing information and providing legal assistance without approval.  (Docket # 43-2 at ¶ 196).

On June 14, 2007, defendant Vocational Supervisor Steve Smith ("Smith") conducted a Tier III disciplinary hearing, found Carlson guilty of two of three charges and sentenced him to serve sixty-three days in the Special Housing Unit ("SHU").  (*Id*. at ¶ 203; Docket # 56 at ¶ 98).  Carlson appealed that conviction and, on January 25, 2008, it was reversed.  (Docket # 43-2 at ¶ 222).  By that time, Carlson had completed his SHU sentence.  (Docket # 56 at ¶ 118).

At the hearing, Smith notified Carlson of the charges against him, as well as his right to defend himself and to present witnesses and documentary evidence.  (Docket # 43-2 at ¶ 205).  Carlson testified at the hearing that he had sought written permission from the Deputy Superintendent for Programming ("DSP") to assist both Bell and Rogner with their legal work, but that he had only received permission to help Bell.  (*Id*. at ¶¶ 163-64, 166-67).  Carlson further testified that during a casual conversation with an officer named "Lieutenant Bob" ("Lt. Bob") and Rogner, he had obtained verbal permission to assist Rogner.  (Docket # 56 at ¶ 76).  Carlson also admitted to possessing the letters from his attorney referring to inmates McKenna and Crump.  (Docket # 43-2 at ¶ 210).

At the hearing, Carlson requested that Smith call four witnesses, including Rogner and Lt. Bob.  (*Id*. at ¶¶ 213, 216).  Two of the witnesses testified, but Smith did not call either Rogner or Lt. Bob.  Smith explained that he decided not to call Rogner, who had been transferred from Livingston, because his testimony would be irrelevant in view of Carlson's admission that he had not received written permission from the DSP to assist him, as DOCS's policy required.

(*Id.* at ¶ 216; Docket # 57).  With respect to his decision not to call Lt. Bob, Smith explained at the hearing that he did not "feel that [Lt. Bob's] testimony [wa]s going to have any bearing on [Carlson's] guilt or innocence."  (Docket ## 43-2 at ¶¶ 213-14; 49, Ex. A at 29, 30).  Smith has further affirmed that, in denying Carlson's request, he had assumed that "what inmate Carlson had told me about his conversation with Lt. Bob was true."  (Docket # 49 at ¶ 24).

At the conclusion of the hearing, Smith found Carlson guilty of providing legal assistance without approval and possessing crime and sentence information pertaining to other inmates.[3]  Smith's written disposition noted that Carlson had not obtained approval from the DSP to perform legal work for three of the four inmates whose work had been found in Carlson's cube.  (Docket # 49, ¶ 28, Ex. B).

III.  **Conditions in the Special Housing Unit**

Carlson spent his first week in SHU at Orleans Correctional Facility and served the rest at Lakeview Correctional Facility.  (Docket # 44, Ex. A at 122).  He was allowed use of his wheelchair at Orleans, but not at Lakeview.  (*Id.* at 124).  Otherwise, the conditions of his confinement at both facilities were the same.  (*Id.* at 122).  Specifically, he was locked in his cell for twenty-three hours a day, was permitted to shower only two days a week and had no access to the library, gym, commissary or AA meetings.  (Docket # 56 at ¶¶ 103, 111).  In addition, Carlson alleges that he was not permitted to clean his residual limb and gel liners on a daily basis as required.  (*Id.* at ¶¶ 114-115).

---

[3]  Smith found Carlson not guilty of possession of an altered item.  (Docket # 49 at ¶ 28, Ex. B).

IV.  **Requests for Accommodation under the ADA**

On May 16, 2005, pursuant to the Americans with Disabilities Act ("ADA"), Carlson requested a transfer from Gowanda to a "flat facility" with no stairs.  (Docket # 44-2 at ¶¶ 35, 38).  On May 19, 2005, his transfer request was granted.  (*Id*. at ¶ 42).  As discussed above, he was transferred to Livingston on July 14, 2005.

On April 7, 2006, Carlson made a second request for an accommodation under the ADA.[4]  (Docket # 44-2 at ¶ 112).  Specifically, Carlson requested that he be transferred "to a facility more able to meet [his] needs." (*Id*. at ¶ 115).  His request was made on a DOCS Form No. 2614 entitled "Request for Reasonable Accommodation" and was accompanied by a four-page letter to the Superintendent in which he expressed dissatisfaction with his medical treatment, stated that he did not wish to be assigned a mobility assistant, requested new shower chairs and suggested structural changes to be made at Livingston.  (*Id*. at ¶¶ 118-23; Docket # 50, Exs. A, B).  On May 8, 2006, after it was discussed with DOCS's ADA Coordinator, Carlson's request for a transfer was denied by the Deputy Superintendent for Administrative Services, J. McAnany.  (*Id*. at ¶ 141; Docket # 46, Ex. A).  In his denial, McAnany noted that a new shower chair had been purchased, a mobility assistant was available and Livingston was designated as a "handicap facility."  (Docket # 46 at Ex. A).  Carlson wrote a letter to McAnany stating that he disagreed with the denial.  (*Id*.).  He did not appeal the determination through the grievance program.  (Docket # 43-2 at ¶ 146).

---

[4]  Both parties agree that Carlson's request is erroneously dated "6/7/06," but actually was submitted on "4/7/06." (Docket # 44-2 at ¶ 114).

Defendants have submitted the affidavit of Robert F. Raymond, a former DOCS ADA Coordinator. (Docket # 50 at ¶ 2). According to Raymond, in order for an inmate to seek review of a denial of a requested ADA accommodation, he must file an appeal through the grievance program. (*Id*. at ¶ 17). The DOCS form for requesting ADA accommodations, which Carlson used to make both of his requests, advises the inmate of his right to appeal the denial through the grievance program. (Docket # 50, Ex. B).

## DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the court must assess whether there are any disputed material facts and, in so doing, must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 166-67 (2d Cir. 1991). A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248; *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d at 97.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, after which the non-moving party must come forward with sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based

upon conjecture, surmise or the existence of "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The party seeking to avoid summary judgment "must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 . . . , that there are specific factual issues that can only be resolved at trial." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *see also Driscoll v. Townsend*, 60 F. Supp. 2d 78, 80 (W.D.N.Y. 1999).

> As the Second Circuit has explained:
>
> [T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution . . . . [I]t must be kept in mind that only by reference to the substantive law can it be determined whether a disputed fact is material to the resolution of the dispute.

*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## I.  Claims As To Which Carlson Concedes Dismissal

At oral argument on this motion, Carlson's counsel conceded that summary judgment is proper on several of the claims. I address those first.

I turn first to Carlson's claims that Livingston's Superintendent Malcolm Cully violated his rights under the First, Eighth and Fourteenth Amendments as alleged in Count Two of his complaint. At oral argument on this motion, counsel conceded that Carlson's complaint fails to allege that Cully was personally involved in any of the alleged violations and that the claims against him should be dismissed. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)

10

(personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983).  Accordingly, defendants' motion for summary judgment on the claims against Cully is granted.

In addition, counsel also conceded that summary judgment must be granted on Carlson's Section 1983 claims against DOCS because DOCS is immune from suit under the Eleventh Amendment.  *Davis v. New York*, 316 F.3d 93, 101-02 (2d Cir. 2002).  Both parties agree, however, that Carlson's claims against DOCS under the ADA and the Rehabilitation Act remain.  *See Tennessee v. Lane*, 541 U.S. 509 (2004).

Finally, Carlson's complaint asserts various constitutional violations based on the search of his cube.  At oral argument, however, counsel conceded that these claims do not fall within the scope of Section 1983 and should be dismissed.  Accordingly, this Court grants summary judgment on Carlson's claims against defendants Smith, Clifford and Yonkers regarding the search of his cube.

As a result, the following claims remain: (1) that Parry violated the Eighth Amendment by (a) requiring Carlson to attend AA and NA meetings which entailed a substantial amount of walking and (b) assigning him to work on the Utility Gang; (2) that Parry made these assignments in retaliation for Carlson's filing of a Notice of Claim against New York State; (3) that Smith denied him due process at the Tier III disciplinary hearing; and finally, (4) that DOCS failed to accommodate his disability under the ADA and Rehabilitation Act.  I address each claim in turn below.

## II.  <u>Eighth Amendment Claims Against Parry</u>

Carlson's complaint asserts claims that Parry acted with deliberate indifference to his safety as an amputee when Parry (1) directed Carlson to attend AA and NA meetings, which required him to walk nearly one mile round-trip in order to attend, and (2) assigned Carlson to the Utility Gang, a program that required inmates to perform outdoor physical labor, such as mowing lawns.[5]  Parry argues that he is entitled to summary judgment on these Eighth Amendment claims.

Under the Eighth Amendment, inmates are protected from punishments that "involve the unnecessary and wanton infliction of pain," *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert. denied*, 513 U.S. 1154 (1995), which include actions that "transgress today's 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency,'" *Hutto v. Finney*, 437 U.S. 678, 685 (1978) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)).  The Eighth Amendment further requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

---

[5] Carlson has admitted that he did not file a grievance complaining about Parry's actions, claiming that he did not do so because he was "fearful of further more severe, retaliation." (Docket # 33 at ¶ 52).  Although the exhaustion requirement is generally mandatory, an inmate's failure to exhaust may be excused in some circumstances if an inmate demonstrates that threats or intimidation either "rendered all administrative remedies unavailable . . . [or that] some procedures that would ordinarily be available were effectively unavailable." *Hemphill v. New York*, 380 F.3d 680, 687 (2d Cir. 2004).  Whether remedies were unavailable is an objective inquiry, asking whether "a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation omitted).  "[M]ere allegation[s] of a generalized fear of retaliation [are] insufficient" to excuse a failure to file a grievance. *Brown v. Napoli*, 687 F. Supp. 2d 295, 297 (W.D.N.Y. 2009) (collecting cases).  In addition, the failure to allege that the inmate was specifically threatened regarding the grievance procedures may lead to the conclusion that a similarly-situated individual may have not considered the administrative remedies unavailable. *Snyder v. Whittier*, 428 F. App'x 89, 91 (2d Cir. 2011).

Defendants do not seek summary judgment on this ground, however, although they have asserted failure to exhaust administrative remedies as an affirmative defense in their answer.  (Docket # 34 at ¶ 19).  Accordingly, I do not address whether Carlson's allegation of fear is sufficient to excuse his failure to grieve Parry's actions.

Prison officials are thus liable under Section 1983 "for harm incurred by an inmate if the officials acted with 'deliberate indifference' to the safety of the inmate." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir.1996) (quoting *Morales v. New York State Dep't of Corr.*, 842 F.2d 27, 30 (2d Cir. 1988)).   Determining whether a prison official's actions rise to the level of deliberate indifference requires consideration of a two-part test:

> First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm. Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

*Hawkins v. Nassau Cnty. Corr. Facility*, 781 F. Supp. 2d 107, 112 (E.D.N.Y. 2011) (quoting *Hayes v. New York City Dep't of Corr.*, 84 F.3d at 620)); *see also Phelps v. Kapnolas*, 308 F.3d 180, 185-86 (2d Cir. 2002).

As to the first prong, a claim for deliberate indifference may lie where a prison official compels an inmate to perform physical labor that is beyond his strength, endangers his life or health or causes undue pain.  *See*, *e.g.*, *Ambrose v. Young*, 474 F.3d 1070, 1078 (8th Cir. 2007) (objective component satisfied where corrections officer ordered prisoners to extinguish non-threatening fire within reach of downed power line); *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006) (prison must take "reasonable measures to guarantee [inmate's] safety" in work assignments); *Jackson v. Cain*, 864 F.2d 1235, 1247 (5th Cir. 1989) (summary judgment for defendants improperly granted on Eighth Amendment claim by prisoner that defendants' requirement that he perform heavy labor aggravated his medical condition); *Gill v. Mooney*, 824

F.2d 192, 195 (2d Cir. 1987) (finding colorable Eighth Amendment claim where inmate fell from ladder after warning corrections officer that ladder was unsafe).

An Eighth Amendment claim may also be asserted where prison officials deliberately disregard the unique needs of a disabled inmate. *See, e.g.*, *Frost v. Agnos*, 152 F.3d 1124, 1129 (9th Cir. 1998) (denying summary judgment where disabled prisoner on crutches alleged that slippery shower floors created substantial risk to his safety); *Allen v. Morris*, 2010 WL 1382112, *5 (E.D. Ark.) (denying summary judgment where amputee-inmate alleged that jail showers posed risk to his safety and he was injured as a result of slipping and falling in the shower), *report and recommendation adopted by* 2010 WL 1382116 (E.D. Ark. 2010); *Muhammad v. Dep't of Corr.*, 645 F. Supp. 2d 299, 317 (D.N.J. 2008) (denying summary judgment on Eighth Amendment claim brought by amputee-inmate who was assigned to an upper bunk and whose cell was located far from handicapped-accessible shower); *Lamzot v. Phillips*, 2006 WL 686578, *5 (S.D.N.Y. 2006) (disabled inmate met objective prong of test where he alleged that he was denied access to a handicapped-accessible bathroom).

Based on the above-cited authority, I easily conclude that Carlson's allegations raise a triable issue of fact whether the conditions of his confinement – specifically, the requirements that he walk nearly one mile daily to attend AA and NA meetings and work on the Utility Gang – posed a substantial risk to Carlson's safety.[6]

---

[6] Carlson does not argue that his rights were violated when he was removed from the Utility Gang; therefore, this is not a case where an inmate attempts to assert a right to a particular job assignment. *See, e.g.*, *Frazier v. Coughlin*, 81 F.3d 313, 318 (2d Cir. 1996) ("prisoner has no protected liberty interest in a particular job assignment"). Rather, the issue is whether Parry violated Carlson's Eighth Amendment rights by giving Carlson a work assignment that was beyond his physical capabilities.

A closer question is whether an issue of fact exists as to the subjective prong of the test, which requires the court to consider whether the prison official had "knowledge that an inmate faces a substantial risk of serious harm *and* . . . disregard[ed] that risk by failing to take reasonable measures to abate the harm." *Hayes*, 84 F.3d at 620 (emphasis added).  The official must be aware of facts giving rise to an inference that a substantial risk of serious harm exists, and he must also draw that inference.  *Id.*  The subjective component requires more than a showing of mere negligence.  *Farmer v. Brennan*, 511 U.S. at 835.

Construing the facts in favor of Carlson as I must on this motion, they show the following.  When Carlson arrived at Livingston, he was suffering from six or seven fluid-filled hot spots on his residual limb.  Soon after his arrival, Carlson met with Parry and advised him that he could not work in the mess hall because his prosthesis was broken, could not stand for long periods of time and could not walk any significant distance.  Carlson even removed his residual limb from his prosthesis and showed it to Parry.  Finally, Carlson told Parry that he had injured his shoulder and could not lift any significant weight.  Parry responded by directing Carlson to attend daily AA or NA meetings, which were held in a building approximately 700 yards from Carlson's dormitory.  According to Carlson, when he saw Parry a month later, Parry asked whether he had been attending AA and NA meetings.  Carlson told him that he was in too much pain to walk the long distance to the meetings and had stopped attending.  Parry responded that he would be receiving a "nice cushy" job assignment, and the next day Parry assigned him to the Utility Gang.

Drawing all reasonable inferences in favor of Carlson, I find that an issue of fact exists whether Parry knew, and unreasonably disregarded the risk, that an assignment involving

walking nearly a mile daily and performing manual labor would pose a substantial risk to Carlson's safety and health as an amputee. Considering Carlson's conversation with Parry when he arrived at Livingston about his physical limitations and medical condition, questions of fact plainly exist as to the extent of Parry's knowledge of both and the risks posed by walking long distances and performing manual labor.[7] *See, e.g., Jackson v. Cain*, 864 F.2d at 1247 (denying summary judgment where inmate alleged that he had notified medical personnel that his condition required special treatment and his work assignment was causing him injury); *Walker v. Dep't of Corr. Serv.*, 2012 WL 527210, *2 (S.D.N.Y. 2012) (claim for deliberate indifference may be supported by allegation that plaintiff "informed [defendant] as to his alleged medical problem, and that [defendant] understood the condition to necessitate allowances or accommodations that [defendant] purposely withheld from plaintiff"); *Allen v. Morris*, 2010 WL 1382112 at *5 (denying summary judgment where amputee-inmate alleged that he told jail officials that he needed a shower chair but his request was denied); *Lamzot v. Phillips*, 2006 WL 686578 at *6 (denying summary judgment where inmate alleged that he twice advised defendant officer that using a non-handicapped bathroom was dangerous, but officer ordered him to use it anyway). Accordingly, I deny summary judgment on Carlson's Eighth Amendment claims against Parry.

---

[7] Although Carlson performed minimal manual labor while assigned to the Utility Gang, the absence of physical injury does not warrant summary judgment, but may limit Carlson's available damages. *See Thompson v. Carter*, 284 F.3d 411, 418 (2d Cir. 2002) (under Section 1997e(e) of the PLRA, an inmate cannot "recover for damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury"; for this reason, where no physical injury is alleged, an inmate's damages are limited to nominal or punitive damages); *Hill v. Washburn*, 2011 WL 846558, *8 (W.D.N.Y. 2011) (Section 1997e(e) does not limit the availability of nominal damages). A review of Carlson's complaint reveals that he has asserted a claim for punitive damages against Parry. (Docket # 33 at ¶ 56).

**III.   Retaliation Claim Against Parry**

I turn next to Carlson's claim that Parry assigned him to the Utility Gang in retaliation for filing a Notice of Intent to sue the State.  Specifically, Carlson claims "upon information and belief" that Parry knew of his Notice of Intent and that Parry's conduct was "at least partly in retaliation for [p]laintiff's exercise of constitutionally guaranteed rights."  (Docket # 33 at ¶¶ 53-54).  In addition, a fair reading of Carlson's complaint reveals a claim that Parry assigned him to the Utility Gang in retaliation for Carlson's decision to stop attending AA and NA meetings.  (*Id*. at ¶¶ 27, 37-39).

Courts examine prisoner retaliation claims "with skepticism and particular care" because they are easily fabricated.  *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003); *Smith v. Napoli*, 2007 WL 4180708, *3 (W.D.N.Y. 2007).  To establish a First Amendment retaliation claim, a plaintiff must demonstrate that (1) the conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected activity and the adverse action.  *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004).  Within the prison context, a common form of constitutionally protected speech is the filing of a lawsuit or inmate grievance.  *See*, *e.g.*, *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (neither party disputes that prosecution of a lawsuit and the filing of grievances are constitutionally protected activities); *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) ("[t]he right to petition government for redress of grievances – in both judicial and administrative forums – is among the most precious of the liberties safeguarded by the Bill of Rights") (internal quotation omitted); *Colon v. Coughlin*, 58 F.3d at 872.

First, no question exists that Carlson's filing of a Notice of Intent qualifies as activity protected under the First Amendment. His decision to stop attending AA and NA meetings, however, is not protected activity. Second, considering his condition as an amputee, Carlson's assignment to an outdoor work crew may be considered an adverse action. *See Davis v. Goord*, 320 F.3d at 353 ("[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation"). This leaves the third question of the causal connection between Carlson's filing of the Notice of Intent and his assignment to the Utility Gang. On this issue, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." *Id*. at 354 (internal quotation omitted).

Although conclusory allegations of a retaliatory motive are insufficient to survive a motion for summary judgment, *Webster v. Fischer*, 694 F. Supp. 2d 163, 183 (N.D.N.Y.), *aff'd*, 398 F. App'x 683 (2d Cir. 2010), the temporal proximity between the protected conduct and the adverse action may reasonably support an inference of a retaliatory motive, *id*; *Davis*, 320 F.3d at 354. The Second Circuit has declined to draw "a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," preferring instead that a district court exercise its judgment "about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (internal quotation omitted). In the exercise of that judgment, courts frequently have concluded that evidence of a close temporal proximity, without more, is insufficient to raise a triable issue of fact. *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 371 (S.D.N.Y. 2011)

18

(temporal proximity in combination with plaintiff's good prison record insufficient to defeat

summary judgment); *Webster v. Fischer*, 694 F. Supp. 2d at 183-84 (proximity of two months

between complaints and misbehavior reports insufficient where plaintiff did not have favorable

disciplinary record); *Williams v. Goord*, 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000) (fact that

misbehavior report was filed three days after filing grievance did not raise triable issue of fact on

retaliation claim).

   In this case, Carlson filed his Notice of Intent on August 15, 2005.

Approximately two weeks later, on September 2, 2005, Carlson learned that he had been

assigned to the Utility Gang.  Carlson has failed, however, to offer any direct or other

circumstantial evidence that Parry knew of, let alone was motivated by, Carlson's filing of the

Notice of Intent.  *Cf. Colon*, 58 F.3d at 873 (plaintiff alleged that defendant had admitted a

retaliatory scheme).  Indeed, the Notice of Intent did not name Parry, but named the State of New

York, and related to an incident that had occurred in a different facility from the one in which

Parry worked.  (Docket # 44, Ex. F).  On this record, I find that Carlson has failed to adduce any

facts or credible inferences that Parry even knew about Carlson's filing when he assigned

Carlson to the Utility Gang.  *Compare Colon*, 58 F.3d at 873 ("if . . . circumstantial evidence [of

temporal proximity] represented the sum total of [prisoner-plaintiff's] proof, we might be

inclined to affirm the grant of summary judgment based on the weakness of [his] case") *and*

*Brown v. Graham*, 2010 WL 6428251, *18-19 (N.D.N.Y. 2010) (denying summary judgment

where sole evidence consisted of temporal proximity and no evidence that defendant was aware

of plaintiff's grievance), *report and recommendation adopted by* 2011 WL 1213482 (N.D.N.Y.

2011), *aff'd*, 2012 WL 933993 (2d Cir. 2012) *with Solman v. Manzi*, 2010 WL 3829149, *1

(D. Conn. 2010) (granting motion to reconsider dismissal of retaliation claim where inmate alleged that officer filed misbehavior report two weeks after he filed grievance about the same officer); and *Zaire v. Doe*, 2006 WL 1994848, *5 (N.D.N.Y. 2006) (denying summary judgment where officer was aware of plaintiff's favorable verdict in lawsuit and officer filed false misbehavior reports two weeks after verdict).

Accordingly, I grant Parry's motion for summary judgment on Carlson's retaliation claim.[8]

## IV.  Due Process Claims Against Smith

To survive a motion for summary judgment on a claim of denial of due process in connection with a disciplinary hearing, the inmate must establish that his punishment was sufficiently severe to implicate a liberty interest. *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (plaintiff "had 'no right to due process [at his hearing] *unless* a liberty interest' was infringed as a result") (quoting *Scott v. Albury*, 156 F.3d 283, 287 (2d Cir. 1998)) (emphasis in original); *Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000).  A prisoner's liberty interest is implicated by a disciplinary sentence to SHU confinement only where the confinement "imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Palmer v. Richards*, 364 F.3d at 64 (quoting *Sandin v. Conner*, 515 U.S. 472 (1995)).  Of course, where an inmate was afforded all the process he was due, the issue of whether a liberty interest is implicated is immaterial.  *See id*. at 64, n.1.  For the reasons discussed below, I find

---

[8]  To the extent that Carlson's complaint may be read to include claims of retaliation for requesting ADA accommodations, those claims are defeated by Carlson's admission during his deposition that he was not retaliated against for those reasons.  (Docket # 44, Ex. A at 76).

that Carlson was afforded all the process he was due at his disciplinary hearing; accordingly, I do not address whether his sixty-three day sentence in SHU implicated a liberty interest.[9]

In order to satisfy due process requirements, a prison disciplinary proceeding must afford the prisoner: notice of the charges; the opportunity to call witnesses and present documentary evidence; and, a written statement from the fact finder as to the evidence relied upon and the reasons for the disciplinary action taken.  *Wolff v. McDonnell*, 418 U.S. 539, 563-66 (1974).  Here, Carlson contends that Smith deprived him of the right to counsel, to confront witnesses, to call witnesses and to review the evidence against him.  (Docket # 33 at ¶ 96).  Because the Constitution does not require the right to counsel in a prison disciplinary hearing, I grant summary judgment to defendants on that claim.[10]  *See Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993) (inmate entitled to "some assistance" in marshaling his defense under certain circumstances, but not entitled to obtain counsel); *Loving v. Selsky*, 2009 WL 87452, *1-2 (W.D.N.Y. 2009) (inmate's right to assistance during disciplinary hearing "fall[s] far short of the right to counsel that the Sixth Amendment guarantees to criminal defendants").

## A. **Denial of Witnesses**

Carlson alleges that Smith's failure to call Rogner and Lt. Bob as witnesses at the disciplinary hearing violated his right to due process under the Fourteenth Amendment.

---

[9]  In this case, the liberty interest issue would involve consideration of Carlson's claims that he was denied use of a wheelchair and was not permitted to clean his limb and gel liners on a daily basis as he required.  *See Palmer*, 364 F.3d at 65 ("SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions . . . or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical").

[10]  At the hearing, Smith advised Carlson that he was not entitled to a hearing assistant because he was not in SHU or keeplock confinement.  (Docket # 43-2 at ¶ 206).

"[T]he prisoner's right to call witnesses and present evidence in disciplinary hearings [may] be denied if granting the request would be 'unduly hazardous to institutional safety or correctional goals.'" *Freeman v. Rideout*, 808 F.2d 949, 953 (2d Cir. 1986) (quoting *Ponte v. Real*, 471 U.S. 491 (1985)).  A hearing officer may also refuse to call witnesses if their testimony would be insufficiently exculpatory, immaterial or cumulative.  *E.g.*, *Scott v. Kelly*, 962 F.2d 145, 146-47 (2d Cir. 1992) (prisoner's request for witness may be denied on grounds of relevance); *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991) (inmate's right to call witnesses and present evidence at disciplinary hearing may be denied if requested evidence would be irrelevant or unnecessary).  A hearing officer may not, however, deny such a request without a finding that the witness's testimony would be unnecessary or would jeopardize institutional goals.  *Walker v. Bates*, 23 F.3d 652, 659 (2d Cir. 1994), *cert. denied*, 515 U.S. 1157 (1995).

Here, Smith has affirmed that, in denying Carlson's requests to call the two witnesses, he credited Carlson's testimony about his conversation with Lt. Bob and Rogner. Carlson was nonetheless found guilty of assisting other inmates because Carlson had not obtained permission from the DSP, as DOCS policy required.  Because Smith credited Carlson's version of his conversation with Lt. Bob and Rogner, their testimony would have been cumulative and immaterial to the question of whether Carlson had obtained permission from the DSP.  Thus, Smith did not violate due process by denying Carlson's request that Lt. Bob and Rogner be called as witnesses.

### B.  Opportunity to See Documentary Evidence

Carlson's complaint also alleges he was not permitted to see the evidence presented against him – specifically, the material that was inventoried as "objectionable content" on his misbehavior report.  (Docket ## 33 at ¶¶ 84, 96; 56 at ¶ 89).

Due process considerations entitle an inmate to view evidence critical to his guilt or innocence of disciplinary charges.  *See*, *e.g.*, *Young v. Lynch*, 846 F.2d 960, 963 (4th Cir. 1988) (due process may require production of evidence "when it is the dispositive item of proof, it is critical to the inmate's defense, it is in the custody of prison officials, and it could be produced without impairing institutional concerns").  In this case, however, Carlson admitted to possessing the material giving rise to the disciplinary charges.  (Docket ## 43-2 at ¶¶ 209-10; 57 at ¶¶ 209-10).  Carlson's sole defense was Lt. Bob's alleged verbal permission.  Under these circumstances, no due process violation occurred.

### C.  Sufficiency of the Evidence

Finally, I reject Carlson's challenge that his disciplinary conviction violates due process.  (*See* Docket # 33 at ¶¶ 118-120).  Under the due process clause, the results of a hearing must be supported by reliable evidence in the record.  *See Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985) (disciplinary decision must be supported by "some evidence in the record"); *Luna v. Pico*, 356 F.3d 481, 489 (2d Cir. 2004) (interpreting *Hill* to require "reliable evidence").  Here, the hearing record included evidence that Carlson admitted possessing legal materials relating to four inmates, three of whom he had not obtained permission from the DSP to assist.  The hearing officer's determination of guilt was supported by "reliable evidence" in the record and thus does not violate due process.

## V.   ADA and the Rehabilitation Act Claims Against DOCS

Finally, I address Carlson's claims under the ADA and the Rehabilitation Act in Counts Three and Four of his complaint, alleging that he was denied reasonable accommodations, such as ramps and accessible facilities.[11]   (*See* Docket # 33).   Defendants contend that summary judgment is warranted because Carlson failed to exhaust his administrative remedies before filing suit.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."   42 U.S.C. § 1997e(a). Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes."   *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

"The ADA falls within the rubric of 'any other federal law.'"   *Carrasquillo v. City of New York*, 324 F. Supp. 2d 428, 442 (S.D.N.Y. 2004).   Thus, under the PLRA, ADA and Rehabilitation Act claims must be exhausted administratively prior to raising them in federal court.   *Pacheco v. Zurlo*, 2011 WL 1103102, *2 (N.D.N.Y.), *report and recommendation adopted by*, 2011 WL 1102769 (N.D.N.Y. 2011); *Alster v. Goord*, 745 F. Supp. 2d 317, 322 (S.D.N.Y. 2010); *Arce v. O'Connell*, 427 F. Supp. 2d 435, 440 (S.D.N.Y. 2006).

---

[11]   Although there are "subtle differences" between the ADA and the Rehabilitation Act, claims brought under those statutes are to be treated "identically" unless one of the distinctions is relevant to the case.   *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (considering together claims regarding reasonable accommodations under the ADA and Rehabilitation Act) (citing *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 146 n.6 (2d Cir. 2002)), *cert. denied*, 541 U.S. 936 (2004).

To properly exhaust a claim, a prisoner must comply with the prison's grievance procedure. *Jones v. Bock*, 549 U.S. 199, 218 (2007).  An inmate must exhaust all available remedies, even where the inmate seeks relief that is unavailable in grievance proceedings, including money damages. *Booth v. Churner*, 532 U.S. 731, 741 (2001).  It is undisputed that DOCS has an established grievance procedure through which prisoners may complain about prison conditions, including the denial of requested disability accommodations.  (Docket # 50 at ¶ 17, Ex. A).  *See Reyes v. Punzal*, 206 F. Supp. 2d 431, 432 (W.D.N.Y. 2002); *Pacheco v. Zurlo*, 2011 WL 1103102 at *3-5 (inmate who did not complete DOCS's three-tier grievance process before filing complaint under the ADA failed to exhaust administrative remedies).

Here, Carlson filed two requests for reasonable accommodations while he was incarcerated.  The first was granted,[12] and the second was denied.  Carlson did not appeal the denial of his second request through the grievance process.  There is no evidence in the record that he was prevented from doing so.  Although, as discussed above, Carlson alleged that he was afraid to grieve Parry's actions, he has made no such allegation regarding filing grievances related to his ADA and Rehabilitation Act claims.

To the extent that Carlson's complaint attempts to base an ADA or Rehabilitation Act claim on issues other than those raised in his two accommodation requests – such as, the requirement that he climb and descend stairs, walk long distances and "do vigorous physical

---

[12]  Carlson argues that even though his first accommodation request was granted, the delay in transfer from Gowanda to Livingston amounted to a *de facto* denial of that request.  A delay in implementing an accommodation does not violate the ADA, however, unless the delay was unreasonable or plaintiff has provided evidence of discriminatory intent.  *Lyman v. City of New York*, 2003 WL 22171518, *6 (S.D.N.Y. 2003); *Powers v. Polygram Holding, Inc.*, 40 F. Supp. 2d 195, 202 (S.D.N.Y. 1999).  Here, Carlson has admitted defendants' assertion that Carlson "was required to be housed in a facility in the same geographic region as Gowanda (known as the "Wende hub") [and] it took some time to coordinate the transfer."  (Docket # 57 at ¶ 43).  The record simply contains no evidence of any purposeful delay or discriminatory intent.

labor" on an ill-fitting prosthesis (Docket # 60 at 16-17) – the record demonstrates that he failed to pursue those issues administratively.  Thus, having failed to exhaust his administrative remedies, Carlson is barred from seeking judicial relief.  *See Jones v. Bock*, 549 U.S. at 211 ("[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court") (internal citations omitted).

Accordingly, because no issue of fact exists that Carlson failed to exhaust his administrative remedies, summary judgment is granted to defendants on Carlson's claims under the ADA and Rehabilitation Act.


## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment **(Docket # 43)** is **GRANTED in PART** and **DENIED in PART**.  Specifically, summary judgment is granted on all claims except Carlson's Eighth Amendment claims against Parry.  A **telephone conference** shall be held on **May 2, 2012**, at **11:30 a.m.**, to set a trial date.

**IT IS SO ORDERED.**


    *s/Marian W. Payson*                           
        MARIAN W. PAYSON
        United States Magistrate Judge

Dated: Rochester, New York
          March   29  , 2012